Thank you, Your Honors. May it please the Court, Christopher Wrench, on behalf of the State, I would like to reserve four minutes for rebuttal, and I will keep an eye on my clock. Frye's shackling claim fails under either the extreme deference in AEDPA or on de novo review. Both the assumed facts in State court and the facts developed at the later federal evidentiary hearing showed a single instance of in-courtroom shackling that was promptly corrected by both the defense counsel and the trial court. Ritchie Well, but that one that you mentioned, would that be Ms. Sylvie? Juror Sylvie? Wrench Correct. That was Juror Sylvie. Ritchie Is that the one who said that when she saw that, that that gave her a flavor of danger? Wrench Correct. That was her inference, which is the inference the law sort of expects individuals to draw from shackling. That's the reason visible courtroom shackles are a constitutional violation absent State justification. So I think Juror Sylvie's memory is an example of her sort of confirming that she did draw the inference that the case law would sort of predict a juror to draw. What's important about her memory about the flavorness or the flavor of danger was also her vivid memory of the immediate correction of the shackling. So it wasn't simply her memory of, oh, this is a flavor of danger. It was an equal memory of defense counsel stood up, made the proper objection, the trial court sustained the objection and issued a limiting instruction. Can we go to your, I think you briefed the issue of the clearly established law. Could you tell me why it is that you don't, do you agree that we should be applying the Sixth Circuit understanding as they stated that in Bacon? No, the State does not agree. So you would, you would advocate for a split? We would. Yes. And that primarily derives from, from deck itself. And the State takes deck at its own words when it said that it was going to consider whether. What does Holbrook clearly state that unjustified sack shackling is inherently prejudicial? It does not so hold. And it's important under that only square Supreme Court holdings on point count as clearly established federal law. But considering, I mean, you have that and considering that deck said that the prohibition on shackling has ancient roots, just trying to figure out why wasn't shackling a clearly established due process violation prior to 2005? Because no United States Supreme Court squarely held that. Deck itself discussed Holbrook and Illinois v. Allen and Estelle v. Williams. And it characterized those cases as providing statements that suggested a rule. So those cases certainly provided guidance. Well, but deck specifically said, this is deck saying it has long been forbidden the use of visible shackles during the guilty phase, that that was the law. Also that this was, as our chief said, deeply embedded in the law. So did they have to make that pronouncement? Even though that was, according to deck itself, the Supreme Court themselves, long forbidden? Yes. The short answer is yes. The Supreme Court had to make that holding. What about the language in from deck where it says, 35 years ago, when considering the that the Constitution sometimes permitted special measures, including physical restraints. And it cites Allen, but it also cites the Allen saying that that should be used only as a last resort. Correct. What Allen was a confrontation clause case. So it's holding was a confrontation clause holding that a defendant is permitted to be. You're viewing the holding in the most narrowest sense of the term possible. I wouldn't say the narrowest sense, but in a narrow sense. And that's what the Supreme Court tells us. The holding has to be squarely on point. It cannot be sort of cobbled together from dicta or statements or suggestions. I guess, is that even true? If AEDPA is all about ensuring states have fair notice of themes like deck, makes clear that the right to be free from unjustified shackling is ancient. You look at Allen as well to support its conclusion that shackling was prejudicial. Why? That's a California case. Why? Why should we conclude that the California Supreme Court did not know about this ancient right in deck? Doesn't that make a difference here? The state's not asking the court to say there wasn't clearly established California law. There was. California has long prohibited in courtroom shackling without state justification. But to pass through D1 here in federal habeas, Mr. Fry needs to show an unreasonable application of a square Supreme Court holding prohibiting in courtroom shackling. And that did not exist until deck. It's why deck didn't say Illinois v. Allen had already held this. It said Illinois had statements that suggested the rule that deck ultimately adopted. Why hasn't the, I'm sorry, go ahead. The Supreme Court itself has said that not only must the lower courts adhere to the strict holdings of cases, but also to their explication of the governing rules of law, as those roles are necessary to the decision and are not dicta. And that would be part of the explication in Allen. Well, it's not, it's not a holding, and it was not necessary to- It's part of the reasoning to- It is part of- Allen. It was part of sort of an analogous reasoning undertaken in a couple of those cases, which I think I'd point the court to White v. Woodall, which is cited in our briefs as an example of the Supreme Court saying, even if it's fairly logical or clear what the next step in the Supreme Court's jurisprudence would be, the Supreme Court still has to actually take that step before it becomes a holding for clearly established federal law purposes. And the state acknowledges that the outcome in deck is certainly the next logical step from Illinois v. Allen and that line of cases. But, I mean, deck itself was decided for reason. The Supreme Court wasn't simply reiterating- Deck was deciding really whether the longstanding role against Shackling in the guilt phase would be extended to the penalty phase, and there were reasons why you might not think it would be extended to the penalty phase that existed at the time, and that's why the Supreme Court did address that issue in deck. Correct, but the first part of deck starts by saying, we first consider as a general matter whether Shackling is violating, if there's Shackling error at the guilt phase. So deck took the step of undertaking the analysis of whether the due process clause prohibits in court Shackling. I think it's just the way it was written. It's kind of a Justice Breyer way of writing that. He's just pointing out how deeply rooted the unconstitutionality of Shackles during the guilty phase is, so it's a no-brainer to extend it to the penalty phase. I think that's sort of how, that's how Justice Breyer does a lot of his opinions. Well, I don't disagree with the court's comments about Justice Breyer, but I think ultimately, you know, it comes back to we have to take deck for what it says, and it talked about those cases and called them statements that suggested a rule. It didn't say those statements provided a rule or identified a rule. I'll pivot here a little bit. So you agree that unconstitutional prejudice can result even if one juror is biased by the side of the Shackles? Upon a showing of prejudicial error, yes. So I guess I'm trying to figure out why was it reasonable for the California Supreme Court to conclude that Shackling was harmless beyond a reasonable doubt, even though it did not know the extent of the Shackling or the juror testimony? Well, it did know the juror testimony, and it did know the... Was it declaration, right? Correct. Is that what you're calling juror testimony? Yes. There were three, there were two jurors who gave relevant declarations, totaling three total declarations in state court that the California Supreme Court was aware of. And the context that those declarations provided is important to the reasonableness of what the California Supreme Court did. Because in California, state habeas petitioners have to bring their evidence at the outset. That's what California habeas law requires. It's not a notice pleading situation. There's no automatic entitlement to discovery. So the habeas petitioner has engaged in investigation of the claims before filing the petition. And we have affirmative evidence here confirming that Mr. Frye's defense team did exactly what it was supposed to do. Had two investigators from the Capitol Union and the Federal Defender's Office investigate the Shackling claim, talk to jurors. He had a trial investigator in the late 80s who talked to jurors. So there was an extensive investigation. But why wasn't the California Supreme Court, you know, obligated to hold an evidentiary hearing, especially when one juror articulated in the declaration the exact prejudice that makes Shackling unconstitutional with that whole flavor of danger comment? Because in that same declaration, the juror provided evidence of harmlessness, undisputed evidence of harmlessness. So that was the juror saying the defense counsel objected. The trial court sustained the objection. The Shackles were removed and the limiting instruction was given. Well, it's possible that it could have been harmless, but was it beyond a reasonable doubt? Yes. If we're in AEDPA territory, there's, I mean, the Supreme Court said in Brown v. And that's what you argue, that they did? Correct. Yes. The California Supreme Court here would have assumed a constitutional error based on Juror Silvey's seeing the Shackles and her comment about the flavor of dangerousness. But at the same time, a fair amount of jurors could reasonably conclude harmless error based on the totality of the factors I discuss. And additionally, just the overwhelming, compelling evidence of Mr. Fry's guilt. These Shackles occurred once, early in jury selection, Ms. Silvey tells us. It was probably corrected and then an extensive trial occurred where there was compelling evidence of guilt from an eyewitness to corroborating physical evidence, to motive evidence, to consciousness of guilt evidence, to two confessions, and several other incriminating statements from Mr. Fry. Well, I know you're going to the sort of the Brecht prejudice sort of analysis. I guess I want to, I do want to understand the weight of the evidence in that particular prompt. You just mentioned there was a witness, and the witness was the co-defendant? She was not a co-defendant. Oh, that's right, she had immunity. She was given immunity and she was not charged. So she had no interest in that. That's a witness that had no interest in the outcome. She was a, you know, the jury, she had immunity, she did not ask for immunity, but she was given immunity. And she provided corroborated testimony. So even, you know, Mr. Fry is now trying to paint her as guilty. I guess if you could tell me, again, just trying to understand the weight of the evidence. What, what evidence went to, aside from the co- the witness that had immunity, aside from her, what was it that went to the mens rea, the mental state of this individual? What's the evidence? Before the killings, Mr. Fry told Ron Wilson, who was, who worked with the victims, that he was going to knock them out and take their gold. He made comments also to the effect that they shouldn't be carrying their, their money around so much. Someone should knock them out and, and take it from him. Additionally, we have post-murder evidence confirming the mens rea that he ripped a gold bracelet off of Mrs. Brandt's neck. That was corroborated by Mrs. Brandt's son. He also took a vial of gold. Was he there? He was not there at the, at the killings, but he confirmed that she had the necklace and that, and that it had been taken. Similarly, a vial of gold was taken from the house that was later confirmed by a pawn shop owner to have been sold by Mr. Fry, placing him, you know, outside of Ms. Worsing, but placing him inside the home. Ms. Worsing's account- No, there's no question that, that there's evidence that he committed a crime and what level of crime, but I, I, I, the, the question is sort of the, the, the level of mental state. I guess that's what I'm trying to, to, to understand. That's the weight of the evidence I'm trying to understand. In terms of intent to kill? Yes. The, the shotgun blasts, two shotgun blasts at close range to Mr. Brandt. But who, who, who, was there a forensics on that, that put him behind the, the shotgun? No, there was Jennifer Worsing's testimony. Again, setting aside her. Well, I mean, I think we have to, as an initial matter, there's a reasonable jurist would not have to set aside her testimony. She's a corroborated accomplice at worst. And I'm not, I mean, the jury was not required to even find that she was an accomplice. And even if she were an accomplice, the jury gets to credit it under California law with slight corroboration and issue California on direct appeal. The Supreme Court said there was sufficient corroboration. So her evidence to a reasonable jurist could not be discounted as not part of the picture. It's absolutely part of the totality of the evidence. If I could ask you about prejudice here, because moving on beyond the California Supreme Court. Here, unlike, I think it would be the first juror declaration from over a decade after trial highlighting the prejudicial impact of shackling. And it seems like Mr. Frye's shackling was even briefer than the other Ninth Circuit cases finding prejudice. So I guess why, why doesn't that juror testimony or the declaration that the shackles gave Mr. Frye the flavor of danger overcome that? Because first of all, it's a compelling totality of the circumstances. But additionally, this isn't structural error. You know, Supreme Court tells us that shackling can be harmless. So the fact that a juror, a single juror drew a brief inference, that would be expected under the shackling jurors period. Counsel, wasn't it more than one juror? I thought it was Juror Canale. She did not ever say she remembered seeing shackling inside the courtroom. At the federal evidentiary hearing, she reported seeing Mr. Frye in the transportation context outside of the courtroom. So, so, sorry, your response. When we assess the extent and duration of the shackling, because a lot of the cases focus on that, aren't we trying to use that as a proxy for the impact the shackling had on the jury? And here, where we know the shackling stuck in the minds of at least two jurors, granted one was inside, one was outside, but over a decade after trial, why doesn't it matter that the shackling was brief here? For a couple reasons. First of all, the inside, outside court and distinction is critical. This court is held outside the court and shackling is not inherently prejudicial. To the inside the courtroom, a big reason Juror Silvey talked about remembering this was because of how defense counsel made the objection. She said he made a production out of it and it was a memorable objection. She went as far as saying it was such, it was so stupid for him to do it this way. But not just outside, this happened inside the jury room. The jury room? Juror Silvey testified that the jurors mentioned the shackling in the jury room during trial. She, a couple things. She consistently says it was never mentioned during deliberations and she did say one time it was, she thought it was mentioned in the jury room. So it happened in the jury room? According to Ms. Silvey, yes. Well, she's a juror, right? Okay, so she said it happened in the jury room. It happened in the jury room. And that, and that Juror Silvey said that the, prior shackling also, that she thinks that the whole jury saw him shackled in the courtroom. Well that, I mean, bluntly that's not competent evidence of her opinion about what other people, what she believes other people saw. But regardless, if the juror saw what she saw, she saw a mistake that was corrected. She saw a defendant improperly shackled. She saw defense counsel do his job and object. She saw the trial court do its job and remove those shackles. And it's the removal that we haven't really gotten to yet, and it's a key part of this court's case law in both Elmore and Larson, that when shackles are removed, it sends a message that the defendant is not dangerous. So even if Juror Silvey, well I shouldn't say even if, she did draw a flavor of danger inference, that inference was mitigated because the court removed it. And the court is saying to the jury, this was a mistake and I, the trial court, am correcting it. I'm removing those shackles. Juror Silvey said she never saw the shackles again. So the mistake was corrected. The fleeting inference of prejudice was quickly counteracted by appropriate trial court action. Do you want to reserve the balance or do you have more? I don't think I have more unless the court wants to get to anything specific, but yeah. Well can I just ask you, what do you want us to do? What's the state asking us? The state is asking this court to reverse the entry of judgment on the shackling claim and direct the trial court to deny habeas relief on that claim. To consider the other, what, 44 claims? Yes, and then proceed to adjudication. And do you have any understanding or explanation at all for why this case was pending in the Eastern District for 20 years before? It seems as though there's something fundamentally wrong with what's been procedurally has happened here. I mean personally I've been lead counsel on this case for the last 5 or 6 years, so I can't totally speak to the extended history, but there had been, there were numerous extensions by both parties that were agreed to. There was a piecemeal hearing where, in part, on the shackling claim, that took up some time. There's been at least one change in counsel from Mr. Fry and possibly more, but I don't have a sort of succinct answer for why it's taken so long. Let me ask you, you suggest, your request is that we reverse. And in your dealing with the AEDPA, what would be your recommended? I recommend, I mean, I don't have a preference for how the court reversed, but the state would prefer the court to go through AEDPA, add a deference to the state, and reverse strictly under AEDPA. But certainly the court could just bypass AEDPA altogether if it's going to reverse and just assume AEDPA had been bypassed and find harmlessness underbred. All right. Thank you. Thank you, Your Honor. May it please the Court, I'm Michael Snedeker, appearing with my partner, Lisa Short, on this panel, which presents a unique example of the powerful effect of seeing another human being shackled at the wrist, at the waist, and the ankles on somebody who's unaccustomed to such a sight. We had two jurors, 12 years after the trial, submit declarations. One of the jurors, Juror Canale, remembered exactly one thing about all the witnesses, the testimony, the exhibits. She remembered only that Mr. Fry was shackled. Juror Silvey signed a declaration prepared by the Federal Defender's Office that dealt with matters of jury deliberations. But after she signed the typed copy, she added a paragraph in her own handwriting saying, I also saw him shackled, shackled at the waist, shackled at the wrist, at the feet. And it's true. She did say later, and in trial, she said at that time that defense counsel objected and the judge gave them an admonition. But I think from Holbrook v. Flynn, we know that jurors cannot always be completely conscious of the effect of certain sights or certain restraints. And I'm confident that these jurors remembered not any admonition that they remember seeing Mr. Fry shackled. It gave him a flavor of danger that is not going to be dispelled by a judge saying, don't think about that shackling, or don't worry about that shackling. The shackling of the ankles did not occur in court, is that correct? She saw that, I believe her shackling did occur in court. I don't think that's what the magistrate judge found in terms of the factual findings that were ultimately determined. Well, the magistrate judge effectively punched it, I think, by saying whether or not he was shackled at the feet, there was evidence, is not relevant to my determination. I thought that the evidence of any shackling at the feet was outside the courtroom. Well, I believe that it was inside, but I could be wrong. Yeah, you want to look at that, but that's fine. Please proceed. Do you want to talk about clearly established? I do. And whether shackling was clearly established? Well, the idea that a Supreme Court holding is required to define clearly established federal law under 2254D reflects the concern that by relying on Supreme Court dicta, federal habeas relief could be improperly granted on a legal theory which is not plain and undisputed. But this does not apply to legal doctrines which have been never discussed by the Supreme Court, precisely because they reflect basic common law principles that are codified in the Constitution. The Supreme Court has written that there are principles of justice so rooted in their traditions and conscience of our people as to be ranked as fundamental. Shackling and the ban against it is one such principle. In DEC, the court said of its earlier recognitions that shackling was against the law without justification in Illinois v. Allen and Holbrook v. Flynn and Estelle v. Williams. It is clear that this court's prior statements about shackling gave voice to a principle deeply embedded in the law. I just want to ask you, neither Allen nor Holbrook were about shackling defendants, correct? That's correct. So I'm just trying to figure out, and I wanted to give you an opportunity to explain how that meets the standard if those cases were not about shackling defendants. Well, I think they were not. The only reason the U.S. Supreme Court took up the DEC case was to resolve a question for which there was not a consensus, and that is, what's the effect of shackling at a penalty phase? That's the first word of the holding in DEC, is that shackling is also prohibited at the penalty phase. Now, it was an open question because the presumption of innocence has been overcome by the time you get to a penalty phase. Now, along the way, they did make the first formal announcement saying that we hold that shackling was banned at the guilt phase, but had there not been that penalty phase issue, they would not have found a need to because it was so widely understood. It is a principle accepted by every case cited by both respondent and us. Let me ask you this, because before DEC explained why shackling was prejudicial, or why shackling is prejudicial, how would a state know the contours of the right? And the reason I ask this is I'm thinking about our decision in Ghent, which says that a jury's brief glimpse of shackles is not inherently prejudicial. I'm just trying to figure out, and I want to give you an opportunity to explain, but before DEC, how would the California Supreme Court know how to analyze the prejudicial impact of the brief in-courtroom shackling at issue here? They had their own long history of developing law related to the prohibition against shackling without a justification, and I think that every court, every decision that we've cited, all those from the 90s prior to DEC, have all assumed that it was clearly established law that shackling should be banned. There is, you know, Justice Scalia said in Harrington v. Richter that in order for a petitioner to prevail, state court error must be an error well understood and comprehended in existing law beyond any possibility of fair-minded disagreements. Well, there is no disagreement here, nor has there been over the past couple of centuries over whether shackling without justification is permitted in any courtroom. Every single decision that we've cited recognizes that shackling is prohibited. Now, there's scuffling around the edges of how long, the duration, the intensity, but in terms of that fundamental principle, there has not been an expression of a doubt about that. There is, in fact, universal agreement that that is to be banned, and that agreement has been in place longer than the right to call witnesses on your own behalf has been in place. Shackling has been banned throughout the history of our law, and the fact that there's not a direct holding is not relevant, I think. It does not preclude or somehow magically take away the rights to which Mr. Fry had. The whole notion, you know, he cites what cases does the respondent cite for the idea that only a holding of the U.S. Supreme Court can justify a clearly established federal law? Well, he cites Marshall v. Rogers. Marshall v. Rogers is a case about when counsel must be appointed. It concludes as follows. This opinion is instead confined to the determination that the conclusion of the California courts that there was no Sixth Amendment violation is not contrary to clearly established federal law as determined by the Supreme Court of the United States. The word holding does not appear anywhere in this holding. The other case he cites was a case he cited in his opening brief. The case of, pardon me while I shuffle my papers, John. It was White v. Woodall, and White v. Helland for the principle that only holdings would apply, but that case involved whether an adverse inference instruction was required at the penalty phase of a trial about a defendant's failure to testify. And the Sixth Circuit had put together Carter v. Kentucky and Estelle v. Smith and Mitchell v. United States and held that, yes, just as there is a defendant's entitled to an adverse inference instruction at the guilt phase, he also is at the penalty phase. Justice Scalia said no, because it's possible that maybe an adverse inference instruction would not be required for something like feelings of remorse. And because there was a possibility of fair-minded disagreement, the state of Kentucky won. Now, that case also says nothing about a requirement, an absolute requirement, that there only be a holding, square holding from the U.S. Supreme Court that will establish clearly established federal law. And the fact that DEC did not make such a square holding until 2005, or the U.S. Supreme Court did not, does not mean that they didn't squarely recognize that that was the law repeatedly in earlier cases. And that, I think, has always been the law, remains the law, and was the law, in effect, when Mr. Fry was tried. So can I ask you, you know, in Brown v. Davenport, the Supreme Court seemed to indicate that federal rules like Chapman, I'm trying to figure out why did the California Supreme Court exceed that leeway here? Because I think it was so clear, I think it is so clear that they should have done that. It was beyond any reasonable doubt or any standard that it was an unreasonable determination of the facts if they somehow determined that Juror Silvey's, the fact that she had noticed that he had a flavor of danger, and she noticed that for a decade after it happened. But that beyond a reasonable doubt standard is the standard for reviewing errors, I believe, on direct appeal. But this claim, and this is what makes this case, you know, different, this claim was first raised in the state habeas proceeding. That's correct. And so what I'm trying to figure out is could the state court have applied a standard more forgiving of state errors in that posture? It's quite possible, Your Honor, but we don't know because they said nothing. I know, but under Harrington v. Richter, I think we're obligated to, you know, look to see if there could have been. But don't both parties in this case agree that Chapman was the role that the California court applied? Excuse me, Your Honor? I think in the briefs, both sides agreed that the California court applied Chapman. They just argued, one side argued they applied it correctly, and the other side argued they applied it wrong. That's correct, Your Honor. What I hear Chief Judge Murguia saying is that maybe there's a chance that Chapman doesn't apply to review on habeas as opposed to direct. Have you ever seen any law on that? Your Honor, it is possible that the standard, I know that Nunes v. Miller has been criticized by recent cases and that the termination of whether or not there should have been a factual hearing, that standard is not crystal clear right now. But our position is that under any standard, it was so clear that there's no possibility that any fair-minded jurist could look at these declarations and not want further factual development. Or to put it another way, they could say these declarations do not create any sort of justification or requirement or invoke any curiosity about what really happened, and therefore we're not going to allow a factual resolution. So, his points, the appellant's points about duration, I think, have been addressed already, that the whole point of determining, like looking at how long someone was shackled and where they were shackled is to determine whether or not there was any impact and the degree of the impact. And in this unusual case, we know that there was a very powerful impact from the shackling at issue. Well, I guess, can you point to any case, finding direct prejudice due to courtroom shackling that was of similar brief duration here? No, Your Honor, we don't have any of, we have shackling, we have cases where people were shackled for brief times where, it's like in the Larson case, for example, the shackling was found non-prejudicial because of four days. But in terms of being actually prejudicial, I know of no case in this circuit that has found such a short duration to justify a reversal. But I also know of no other case where we have direct language from the jurors about having been profoundly defected. And I believe the whole point of assessing the impact of shackling is that that's what they're driving at when they're looking at how long was the shackles, the intensity of the shackles. And it could well be that somebody could be so moved by the sight of somebody that that's what they can never unsee throughout the process regardless of whether there's additional shackling or whether there are admonitions given. If the shackling can be, and it was in this case, so profoundly affecting that that in itself requires reversal. And I appreciate the argument. I'm trying to figure this out. And it seems like several months elapsed between the shackling and the jurors' guilt verdict and death sentence. And in the meantime, the jurors heard a lot of evidence and very limited mitigation evidence. So I'm trying to figure out, yes, we have the juror's statement, but don't we still look at everything to determine whether or not there was prejudice? And here, it seems like the evidence in front of the jury was substantial and significant. But I wanted to give you an opportunity to talk about that as to why that wouldn't outweigh the juror's statement. Or don't we have to look at everything in context? Your Honor, there was a stout defense presented by Mr. Fry in extensive closing arguments. There was an expert who meticulously reviewed the Department of Justice's treatment of the fundamental disagreements between Jennifer Warson's testimony and what the physical evidence showed. There was evidence. And by the way, now is the right time to do it. I want to ask court for permission to add excerpts of record, because we inadvertently forgot to include excerpts from the autopsy that were developed and argued strongly in the closing argument, indicating that the victims had to have been killed at least an hour before Mr. Fry and Ms. Warson arrived at their house. And other evidence showing lividity of the bodies, indicating that they were turned over somewhere between one and seven or eight hours after they were killed. There was evidence presented about money that the police believed were there and put in the warrant that was not there. There was also evidence, I think, well, I've discussed the issue of confessions, but there was no confession really. But the evidence as was against Mr. Fry was fundamentally rooted in the testimony of Jennifer Warson. His own statements, Ms. Warson's statements, were all of those were directed where the jury was told to consider them and be very cautious when they did and be suspicious of vicarious confessions and of the statements of accomplices. There are evidence that both parties were there. But in terms of who did what, there is a real defense, the kind of defense where people would have to approach it carefully. And I think the jury did that. They wanted to review many parts of the case. And I'm not going to argue that there's not substantial evidence of his guilt, but I am going to say it's not that easy a case. There were lengthy arguments, and I think the jury reflected and it's not so substantial. In the Larson case, the jury came back in three hours. In this case, there were three days of deliberation between 10 and 11 hours. I think that's enough given the amount of prejudice that it doesn't, the prejudice cannot be dispelled by just simply saying, well, it couldn't have made any difference. In Larson, that was a six-day trial? That was a trial in the state of Oregon. Yeah. And so he was, I think, shackled two days of a six-day trial with a security leg brace? That's correct. This court found it to be not prejudicial in that case. For one, he had a, quote, relatively unobtrusive leg brace. He was able to move freely around the courtroom and defend himself for four of the six days. The leg brace is just a far cry from the shackling that is in this case. And plus the fact that there was a very short deliberation by the jury. They came back pretty quickly. And for that reason, the prejudicial effect of the jury having seen him for a couple of days in that leg brace was overcome. That's not true in our case. So on your Chapman argument, just to take you back there for a second, something I'm not clear on is, are you saying that the California Supreme Court made an unreasonable determination of the facts in finding there was no Chapman error? Or are you saying the California Supreme Court should have held an evidentiary hearing under California state rules or state law? They definitely should have held a hearing. That is our position under both state and federal law, under their own law. They're required to take as true any declarations presented by an initial petition of habeas corpus. They had to assume that these declarations were true. I think it was state law error for them not to have granted that hearing. And I think it's also, and I think the deference we owe them is overcome by the power of these declarations that to make some sort of ruling based on, it's true, you are required in fact to imagine what any reasonable, fair-minded jurist could have come up with on the California Supreme Court. Well, I don't see how any such jurist could ever not want to see what these, not wanted to hear from these two declarants and also the other jurors. There's another juror mentioned there are other situations. According to the initial declaration, all the jurors saw it. I mean, the fact that, why would the court not want to flesh this out? I think if you acknowledge that Shackling is banned absent justification as a fundamental principle of law, then you have to elaborate or want to know more facts about those declarations. And I don't think that any fair-minded jurist would think otherwise. I think that's what I have. Do you have any other questions of me? No. Thank you. Thank you, Your Honors. A key word here is branding. In both Dyes and Rodin, this court found prejudicial impact because the defendant was functionally branded as a dangerous individual. That did not happen here. There was a mistaken Shackling instance that was quickly corrected and he never appeared again in Shackling. That is not a situation of branding the defendant as a dangerous individual. Both Dyes and Rodin had a shackled defendant for the entirety of the guilt phases. This was one day in jury selection, not even when evidence had been taken, not even when the entire jury had been sworn in. Not according to Sylvie. According to Sylvie, there were more than one occasion. According to Sylvie, all of the jurors saw this. Juror Sylvie has never said there was more than one instance of Shackling. And when she said she believed the other jurors saw them, that could have been referring to the potential jurors seated in the box with her during jury selection just as much as it could have been during testimony. I'll check on the reference, but I thought she indicated that she saw Fry shackled on the bench, outside the courtroom once. And that along with juror Canales saw Fry shackled in the breezeway and juror Sylvie saying that Fry shackled in the courtroom and that she thinks that the whole jury saw him. I thought that's what she said. Correct. And what I meant, one time I was speaking of inside the courtroom Shackling. I was not referring to outside, which this Court has recognized is not inherently prejudicial. So juror Sylvie identified one instance of in courtroom Shackling. But if your point is branding, right? If you're thinking that that's what the case law is sort of telling us, then what do we make of the statement, you know, the flavor of danger over that many years? Isn't that the branding that sort of has been sort of imprinted in that juror's mind for that many years? No, because the flavor of danger occurred upon the site of Shackling. That's what Ms. Sylvie tells us, which again is what the law would sort of expect. But the law allows for harmlessness. And Ms. Sylvie tells us what she also remembers is that error was corrected and that she never mentioned it or nobody else ever mentioned it during deliberations. So we know. And this was a key fact. The Supreme Court relied on it in the Davenport decision. The juror says it wasn't brought up during deliberation. And it's undisputed here that Shackling was not discussed during the deliberative phase of this case. And it's undisputed that the Shackles were removed. In the jury room, but not during deliberation? Correct. Yeah, there is that part of – well, I should clarify, that is in the federal evidentiary hearing. It's not in the state court record. And so we're allowed to consider it under Brex, but not on the question of whether the California Supreme Court committed Chapman error? Yes. Okay. And then my other question for you is, are you aware of any California law that says that the state Supreme Court applies a different standard than Chapman when it's on habeas review as opposed to direct review? No, Your Honor. The state court here would have – the governing standard would have been Chapman. Right. So we are to apply Chapman. Correct. Yeah. And the question is whether a fair-minded jurist applying Chapman could have found harmless error. And can I ask you – your colleague – I mean, your friend across the aisle just made some statements regarding that the strength of the evidence was not as strong, referencing the autopsy and the timing. Can you respond to that? I don't recall that portion of the autopsy report directly. What is – what was one important aspect of the autopsy report is that it corroborated Ms. Worthing's testimony that Mr. Brand had been shot twice and Mrs. Brand had been shot once. There was expert testimony disputing the processing of the scene, but there was not evidence of innocence. There was – you know, Mr. Fries never identified the killer. Well, Ms. Worthing also testified, if I understood correctly, that, you know, Mr. Fry was talking about hearing the devil, all of those sorts of things, that there was some alcohol, all of those things that Ms. Warren also testified to. And so we have to take that part of the evidence, correct? Correct. That's how she describes some of his statements. But I think it's – speaking of the evidence of guilt, again, it's a totality analysis. And he told Ms. Worthing he killed him. He told Officer Smith, I killed him. He, upon his arrest, sitting in a patrol car, told the officer, do you want the big one? I'm Jerry Fry. I'm wanted for double murder. When he learns that Worthing is not being charged, he's mad and he says, she's an accessory after the fact. She's as guilty as I am. So it's not – this case doesn't rise or fall on sort of any one of these factors. There's evidence from all different angles pointing to the same conclusion. I'm sorry, you said – he said to an officer what? I missed that. The big one? Oh, no, I heard that. The one before that, you said what? It implied that he admitted having killed. This was to an Amador County detective, Anderson, when the detective told Fry that Ms. Worthing was not being charged. Mr. Fry was upset and he said, she is as guilty as I am. She's an accessory after the fact. Again, implying and really not implying, directly stating his guilt, which is consistent with his other confessions. Well, hold on. The state didn't argue that there were confessions at the state court. They said that there were statements, right? Well, some of them were statements. One was – I mean, he told Officer Smith – I don't know if – I'm not sure if the trial prosecutor used the word confession. We checked. I don't think they did. Okay. But maybe your memory is better than I am. I would – I'm not 100 percent sure if they used that word, but reading the California Supreme Court's resuscitation of the fact and the record, he confessed to Ms. Worthing that he killed the Brants and he confessed to Officer Smith that he committed the crimes. The other statements are short of full confessions, but they are nonetheless incriminating. And so you heard Mr. Schnechter say that a state – that it was state law – error not to grant the hearing. So I just – we talked about it briefly before. I just want you to be able to respond to why that isn't the case. It is not the case. It's also not the question under D2 for this court whether the state court violated its own error. I'm sorry. I didn't hear that. I'm sorry. It's not state law error, and it's not – this court does not decide whether the California Supreme Court violated its own error under D2. It determines whether it's unreasonable determination of facts. But importantly, California law says that evidence of your hearings in habeas are to resolve material issues of disputed fact. They only are required when there's a factual dispute and when it's necessary to resolve that dispute. The declarations before the California Supreme – I'm out of time. You may proceed. Thank you, Your Honor. The declarations from the – before the California Supreme Court were undisputed. There was no conflicting evidence. So there was no need for the California Supreme Court to resolve any disputed facts, and it had the result of Mr. Fry's investigation. So it could reason. But was there any obligation, or why wasn't there any obligation for the California Supreme Court to take the juror's declaration regarding the shackling into account? It would have. It would have assumed the truth of those declarations. And assuming those facts, which were undisputed, it could have reasonably made a finding of harmless error under Chapman. And I see I'm out of time. Yes. Any further questions? Thank you both very much. Thank you, Your Honor. Mr. Schnechter, Mr. Wrench, we appreciate, you know, the enormity of this case and the decision and the care in which you took in presenting your oral arguments. The case of Jerry Grant Fry v. Ronald Broomfield is now submitted, and we are adjourned. All rise. This court for this session stands adjourned.
judges: MURGUIA, WARDLAW, MENDOZA